AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**

UNITED STATES DISTRICT COURT
~~UNITED STATES DISTRICT COURT~~
~~ALBUQUERQUE, NEW MEXICO~~

for the
District of New Mexico

JUN 1 5 2015

**MATTHEW J. DYKMAN**
**CLERK**

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

30 Camino Del Albino, Arroyo Hondo,
Taos County, New Mexico

)
)
)
)
)
)

Case No.

15 mr 371

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

30 Camino Del Albino, Taos County, New Mexico (See Appendix A.)

located in the ___County of Taos___ District of ___New Mexico___ , there is now concealed *(identify the person or describe the property to be seized):*

See Appendix B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 and 841 (a)(1)<br>18 U.S.C. 1956 (h), 1956 (a)<br>and 1957. | Conspiracy to possess and distribute controlled substance; possession and distribution of controlled substance; laundering of monetary instruments an engaging in monetary transactions in criminally derived property & conspiracy. |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kevin M. Mondragon, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: June 15, 2015

_____
*Judge's signature*

**KAREN B. MOLZEN**
**U.S. MAGISTRATE JUDGE**
*Printed name and title*

City and state: Albuquerque, New Mexico

## AMENDED AFFIDAVIT IN SUPPORT OF
## APPLICATION FOR SEARCH AND SEIZURE WARRANT

I, Kevin M. Mondragon, Special Agent of the Drug Enforcement Administration (DEA), being duly sworn, state as follows:

## INTRODUCTION

1.      I am submitting this Affidavit in support of an application for a warrant to search the premises at  30 Camino Del Albino, Arroyo Hondo, Taos County, New Mexico for evidence, contraband, fruits and instrumentalities of violations of  21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. §§ 1956(h), 1956(a), and 1957.

2.      I am an investigative law enforcement officer of the United States within the meaning of section 2510(7) of Title 18, United States Code, as a Special Agent of the Drug Enforcement Administration (DEA).  As such, I am empowered to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code, Sections 841 and 881.

3.      I have participated in an ongoing investigation regarding the distribution of illegal narcotics in and around Taos, New Mexico.  Since the investigation's inception, I as well as other DEA Special Agents and law enforcement officials from other agencies have obtained information regarding a conspiracy to distribute controlled substances led by IVAN ROMERO and the illegal transportation and distribution of narcotics by IVAN ROMERO's drug trafficking organization (DTO).

4.      The facts and conclusions set forth in this Affidavit are based on: my personal participation in this investigation; information provided by other Special Agents, Task Force Agents, and law enforcement officers (collectively referred to as the "Agents") from various federal, state, and local law enforcement agencies; my experience and training as a DEA Special Agent.  When I

1

recount that a statement was made, I either have direct knowledge of the statement or the information was provided by another law enforcement agent (who may have had either direct or hearsay knowledge of the statement) and I have spoken to the agent or read the agent's report.

5.     This Affidavit is submitted for the limited purpose of establish probable cause to support the issuance of a warrant to search for and seize property or money described below.  I have therefore not included each and every fact known to him concerning this investigation, and this Affidavit therefore does not contain all of my knowledge about this matter.

## AFFIANT'S BACKGROUND

6.     I have been employed by the DEA since October 2010, and I am assigned to the DEA's Albuquerque Office.  Prior to employment with the DEA, I was employed as a State Police Officer with the New Mexico State Police.  Over the course of my career, I have accumulated the following training and experience.

a.   I graduated from the DEA Academy (Quantico, Virginia).  I received approximately 19 weeks of specialized narcotics related training.  The training included controlled substance identification, narcotics related investigative techniques, interview and interrogation training, preparation of search warrants, tactical applications of narcotics enforcement, surveillance and electronic monitoring techniques, money laundering investigations and various forensic subjects including latent fingerprint collection and analysis.

b.   As a State Police Officer and DEA Special Agent, I have participated in investigations of individuals and organizations trafficking heroin, cocaine, cocaine base ("crack"), marijuana, methamphetamine and other controlled substances as defined in 21 U.S.C.

2

§ 801.  My experience as a Special Agent includes, but is not limited to, conducting surveillance; interviewing witnesses; participating in arrests, searches, and seizures; working in an undercover capacity and working with informants, writing wiretap affidavits, and working money laundering cases.  I have received training and experience in the investigation of violations of the federal drug and money laundering laws.  I have participated in the investigation of several drug trafficking conspiracies.  As a result, I am familiar with matters including, but not limited to, the means and methods used by persons and drug trafficking organizations (DTO) to purchase, transport, store, and distribute illegal drugs and to hide profits generated from those transactions.

7.      Through my training, my experience, and consultation with other law enforcement officers experienced in investigations regarding conspiracy to manufacture, distribute, and possession with intent to distribute controlled substances, I have learned that persons engaged in the illegal drug trade keep drugs, scales, packaging materials, cash, records and other instruments, proceeds and evidence of criminal activity.  Furthermore, through my training and experience persons who traffic in controlled substances are known to keep drugs, currency, and records, in safes, detached storage units, out-buildings, and automobiles.

   a.   Drug traffickers usually maintain an inventory or supply of controlled substances to sustain their illicit business of distributing and selling controlled substances to other persons.

   b.   Drug transactions are usually conducted on a cash-basis.   Drug dealers often accumulate thousands of dollars in cash from the criminal sale of controlled substances.  Drug dealers often retain that cash to avoid generating currency transaction reports and to perpetuate and finance their drug trafficking business. Persons involved in drug trafficking often convert cash proceeds from the sale of controlled substances into other monetary instruments (such

3

as cashier's checks, money orders, bank drafts) to disguise and conduct transactions with the criminal proceeds.  In addition, drug dealers often convert and use the proceeds from the criminal distribution of controlled substances to purchase other assets such as precious metals, gems, jewelry, real estate, vehicles, and other valuables.

c. Drug traffickers commonly utilize telephones, both land-lines and cellular, as a means of communications to conduct and facilitate their criminal activities.  Such devices often store or retain telephone numbers and other information that may identify drug traffickers' associates.

d. Drug dealers often possess firearms and ammunition to protect themselves and their drugs and their drug profits.  They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, and instruction manuals and other documentation for firearms and ammunition.

e. Drug dealers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property, and their drugs.

f. Drug dealers often travel domestically and internationally to facilitate their trade. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts related to travel such as rental car receipts, fuel receipts and hotel receipts, and passports and visas and their contents.

g. Evidence of unexplained income and wealth of drug dealers and of the acquisition and concealment of criminal proceeds can also be found in banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements,

utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and cancelled mail.

h. Drug dealers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Drug traffickers often maintain books, records, receipts, notes, ledgers, airline tickets, money orders, cashier check receipts, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. Further, drug traffickers commonly "front" drugs (provide controlled substances on consignment) to their clients, and records are maintained by such drug dealers so they can account for their drugs and the monies owed for those drugs. Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers, and co-conspirators. Such records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances, customer lists, and amounts of money owed to the trafficker by his customers, and by the trafficker to his suppliers. Records often also indicate locations and distribution points of controlled substances, and the purchase of materials, supplies and articles used by the trafficker and co-conspirators in the distribution of controlled substances. Such records frequently include the identification of properties such as real property or vehicles owned, rented, leased, controlled, or otherwise utilized by the trafficker and his co-conspirators in the distribution of controlled substances. These records may include property rental and

5

ownership records such as deed of trust and lease and purchase agreements, and vehicle registration, rental and ownership information. These records can be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets, IOU's, miscellaneous notes, money orders, customer lists, and telephone address books. These records may also be maintained on computers, tablets, cellular telephones, and other digital devices.[1]

i.   Through my training, my experience, and consultation with other law enforcement officers experienced in investigations regarding conspiracy to manufacture, distribute, and possession with intent to distribute controlled substances, I have learned that drug traffickers often keep controlled substances, large sums of currency, and records and information regarding their criminal activities and transactions in locations where drug traffickers have ready access to them. It is common for drug dealers to keep contraband, proceeds of drug sales and/or records of drug transactions, drug sources of supply, and drug customers in secure locations within residences. Drug traffickers often keep such evidence, instruments and proceeds of their criminal activities outside of their own residences to avoid detection and seizure by officers executing search warrants at their homes. Drug traffickers are known to keep controlled substances, currency, and evidence of their criminal transactions and associations at stash houses, houses owned by criminal associates, garages, storage buildings, safes, vaults, safe deposit boxes, vehicles, and obscure locations such as storage containers buried underground in order to conceal such

---

[1]  A "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; desktop computers; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, memory chips; and security devices.

items from law enforcement authorities.  Persons involved in drug trafficking often conceal caches of drugs, large amounts of currency, financial instruments, and records of their activities and transactions in  residences, businesses, offices, safes, vaults, safe deposit boxes, garages, storage buildings, out-buildings, and vehicles.

## PROPERTY TO BE SEIZED

8.    Based upon the facts summarized in this Affidavit, probable cause exists to believe that IVAN ROMERO has conspired with others to distribute, and has possessed and distributed, controlled substances in violation of 21 U.S.C. §§ 846 and 841(a)(1), and that evidence, instruments and proceeds of those crimes will likely be found at the premises located at # 30 Camino Del Albino, Arroyo Hondo, Taos County, New Mexico.   Those premises to be searched (further described in Appendix A)  include: real property; residence; garage; storage shed; out-buildings; curtilage; and any vehicles belonging to IVAN ROMERO, RICCO ROMERO, WILMA ROMERO or MELISSA ROMERO at that location at the time of the search.

9.    Following his arrest on state controlled substance charges on or about April 2, 2015, bond for IVAN ROMERO's release was set at $90,000.  On or about April 3, 2015, MELISSA ROMERO, RICCO ROMERO, and WILMA ROMERO delivered $90,000 in United States currency to People's Bank in Taos, New Mexico, which they exchanged for a bank check or cashier's check.  Based upon the facts summarized in this Affidavit, probable cause exists to believe that IVAN ROMERO, MELISSA ROMERO, RICCO ROMERO, and WILMA ROMERO conspired to conduct a monetary transaction at People's Bank involved well in excess of $10,000 in criminally derived property, and that financial transaction was designed in whole or in part to conceal and disguise the nature, source, ownership and control of that money, in violation of 18 U.S.C. §§ 1956(h), 1956(a) and 1957.  There is probable cause to believe that

evidence of these crimes will be found at # 30 Camino Del Albino, Arroyo Hondo, Taos County, New Mexico.

## PERTINENT FACTS AND CIRCUMSTANCES

10.    Since 2011, I have participated in an investigation of the illegal drug trafficking activities of IVAN ROMERO and his co-conspirators in Taos County, New Mexico.  I have interviewed multiple confidential sources and sources of information and or have obtained investigative reports from local law enforcement officers detailing the illegal activities of the IVAN ROMERO's drug trafficking organization.  These confidential sources and sources of information have been established to be reliable and accurate on multiple occasions.  Additionally, I have corroborated the information provided by the confidential sources through investigative techniques and by law enforcement reports of other investigative agents.

11.    Informants have disclosed that IVAN ROMERO and members of his family have been selling heroin in and around Taos, New Mexico, for many years.

   a.    A confidential source (CS#1) provided information from approximately 2012 to 2013 regarding drug trafficking activities in and around Taos, New Mexico.  CS#1 provided information to the effect that IVAN ROMERO has been dealing large quantities of heroin for over ten years.   CS#1 has also reported that RICCO ROMERO (one of IVAN ROMERO's brothers) is also involved in selling heroin.  The information provided by CS#1 regarding IVAN ROMERO and other drug dealers has proven accurate over that span.

   b.    CS#2 provided information over a span of approximately seven months in 2014 regarding drug trafficking activities in and around Taos, New Mexico.  CS#2 also provided

information regarding IVAN ROMERO's drug trafficking activities.  Among other things,
CS#2 reported IVAN ROMERO has been dealing heroin for over ten years.  CS#2 has also
identified RICCO ROMERO as a distributor of heroin for IVAN ROMERO.  The
information provided by CS#2 regarding IVAN ROMERO and other drug dealers has
proven accurate and reliable, and CS#2 also provided information to the Taos Police
Department which led to the arrests of other persons for separate offenses.

c.   CS#3 provided information in 2011 for a span of approximately three months regarding
drug trafficking activities in and around Taos, New Mexico.  CS#3 provided information to
the effect that IVAN ROMERO has been dealing cocaine and heroin for over fifteen years.
CS#3 additionally identified RICCO ROMERO as one of IVAN ROMERO's dealers or
distributors of drugs.  CS#3 also stated that IVAN ROMERO's father, ELIAS ROMERO,
had started the family's drug trafficking business approximately thirty years earlier.  CS#3
was also a CS for the Region I Task Force, and the information provided by CS#3 has
proven to be accurate and reliable.

d.   A Source of Information (SOI#1) provided information to the Taos Police Department in
2014 for a two month period regarding criminal activities in and around Taos, New Mexico.
SOI#1 provided information regarding IVAN ROMERO's drug trafficking activities.
SOI#1's historic information regarding ROMERO was more limited than the information
provided by other sources; SOI#1's provided information to the effect that IVAN
ROMERO has been dealing heroin since 2011.  The information provided by SOI#1
regarding IVAN ROMERO and other drug dealers has also proven to be accurate and
reliable.

e.   Another Source of Information (SOI#2) was debriefed regarding the illegal drug

9

trafficking activities of IVAN ROMERO in 2011. At that time, SOI#2 provided

information to the effect that IVAN ROMERO was distributing heroin in and around Taos.

SOI#2 also reported that WILMA ROMERO sold heroin for a short period of time during

2011. SOI#2's information has been corroborated by other information already

established to be accurate and reliable.

f.   A third Source of Information (SOI#3) was recently debriefed regarding the illegal drug

trafficking activities of IVAN ROMERO. SOI#3 provided information to the effect that

IVAN ROMERO has been dealing heroin in and around Taos since at least 2010. SOI#3

also reported that IVAN ROMERO's mother, WILMA ROMERO, actively participates in

the DTO. SOI#3 reported that WILMA ROMERO conceals and maintains drug proceeds

for IVAN ROMERO at her residence. SOI#3's information has been corroborated by

other information already established to be accurate and reliable regarding IVAN

ROMERO.

12.   The information provided by the CSs and SOIs regarding the drug trafficking activities of

IVAN ROMERO and his family is also reflected in criminal records.

a.   Criminal databases show that IVAN ROMERO was convicted of trafficking in

controlled substances in Taos County in 1999 (a misdemeanor conviction for which he

received a suspended sentence). In 2007, IVAN ROMERO was convicted of conspiring to

commit a murder (second degree) that occurred in 2003 and which investigative reports

show was related to a drug debt that the victim owed to IVAN ROMERO.

b.   RICCO ROMERO has an extensive criminal history that includes possession of drug

paraphernalia (2004) and possession of marijuana and drug paraphernalia (2012).

c.   Law enforcement databases reveal that WILMA ROMERO has a lengthy criminal

history marked by multiple prior convictions for controlled substances offenses; WILMA

ROMERO was convicted of controlled substance offenses in 1984 (marijuana), 1985

(methamphetamine and marijuana), 1990 (heroin), and 2000 (trafficking controlled

substance and felon in possession of a firearm).

13.   Acting upon information provided primarily by CS#1 regarding IVAN ROMERO's drug

trafficking activities, law enforcement authorities in Taos County obtained a warrant from a state

district court which authorized the search of IVAN ROMERO's residence.  On or about April 2,

2015, Region III Narcotics Task Force, Taos County Sheriff's Department, the New Mexico State

Police, and DEA agents, executed that warrant at ROMERO's residence in Taos County, New

Mexico.  I assisted in the execution of that warrant.

    a.   Agents made entry into the residence agents and located IVAN ROMERO and his wife

        MELISSA ROMERO, in the residence.

    b.   Task Force Officer (TFO) Don Lopez and I conducted an interview with IVAN

        ROMERO.  TFO Lopez read *Miranda* advisements to IVAN ROMERO regarding his

        rights, including his right to remain silent.  IVAN ROMERO waived his rights and agreed

        to speak with law enforcement agents.  I asked IVAN ROMERO if he had any heroin in the

        residence.  IVAN ROMERO replied "yes" and removed a small plastic baggy from his

        right front pocket and handed it to me.  I recognized through training and experience that

        the small package and its content were consistent with the common packaging and

        appearance of heroin.  IVAN ROMERO also admitted that he possessed more heroin.

        IVAN ROMERO reached into a dresser drawer in the master bedroom, removed a black

        bag and placed it on the bed.  IVAN ROMERO stated, "here it is."  I then asked him what

        was in the black bag.  IVAN ROMERO stated "Chiva."  ("Chiva" is a Spanish-language

term used to refer to heroin.) I asked how much and ROMERO replied "about ten ounces." In the course of the search, Agents also found marijuana in various locations throughout the residence. The marijuana was packaged in jars ready for distribution.

c. A field-test was conducted on a sample of the substances seized from IVAN ROMERO. That sample tested positive for the presence of heroin. The aggregate weight of the heroin seized from IVAN ROMERO was 363.2 grams (gross weight). Based upon my training and experience, I recognized that the quantity of heroin seized from IVAN ROMERO was consistent with drug trafficking amounts and not personal use and had a street-value of approximately $13,000.

d. I asked IVAN ROMERO if he sold heroin. IVAN ROMERO replied that he occasionally sold heroin, but that he would mainly consume it. IVAN ROMERO stated he sold "tripas and ounces of heroin." ("Tripas" is a term often used by drug-dealers and their customers to refer to three (3) grams of heroin.)  IVAN ROMERO also stated he sold ounces of heroin for $1,000 per ounce.

e. In the course of the search, Agents also found and seized approximately $64,920 in United States currency in the master bedroom of IVAN ROMERO's residence.

f. The search also yielded drug trafficking instruments, supplies and paraphernalia including several scales and a large quantity of small plastic baggies. Through training and experience, I know that drug-traffickers often use scales weigh illegal drugs, and that drug distributors often pack user-quantities of drugs in small plastic baggies similar to those located in IVAN ROMERO's residence are used for packaging drugs. Agents also located several drug pipes used to smoke drugs in the living room area.

14. On April 2, 2015, IVAN ROMERO was arrested and charged by State authorities with

12

heroin trafficking.   IVAN ROMERO was detained in the Taos County Adult Detention Center, and his bond was set at $90,000.

15.    On April 7, 2015, I learned that a representative from People's Bank had contacted local law enforcement and reported that on April 3, 2015, MELISSA ROMERO, RICCO ROMERO (IVAN ROMERO's brother), and WILMA ROMERO (IVAN ROMERO's mother) visited the People's Bank branch located at 1356 Paseo Del Pueblo Sur, Taos, New Mexico.  At that time, MELISSA ROMERO, RICCO ROMERO and WILMA ROMERO presented $90,000 in United States currency which they exchanged for a bank check or cashier's check (#292931) subsequently used to post IVAN ROMERO's bond.  People's Bank is insured by the Federal Deposit Insurance Corporation and is a financial institution as defined in 31 U.S.C. § 5312(a)(2). That bank's surveillance video system recorded RICCO ROMERO enter the bank carrying a black bag or case and accompanied by MELISSA ROMERO and WILMA ROMERO.  The video shows all three of them proceeded to meet with the teller and who conducted the transaction in which $90,000 in currency was exchange for the cashier's check.   Bank employees contacted law enforcement because upon receiving the currency they noticed the money contained an odd smell and it reportedly made bank employees' eyes "itch and burn." Employees of People's Bank set aside and secured the suspicious currency.

16.    On April 10, 2015, other law enforcement officers and I went to the branch of People's Bank in Taos to examine the currency.   The New Mexico State Police assisted and provided a drug-detection canine named Arras.  Arras is trained to detect and alert to the odors of marijuana, cocaine, methamphetamines, heroin and their derivatives.  The $90,000 in United States currency that the ROMERO family had delivered to the bank was placed in a DEA box.  That box and two other (empty) boxes were placed in a conference room.  Arras was brought into that room and

13

conducted an off-leash open-air inspection.  Arras alerted to the odor of narcotics at the box

containing the currency.

17.    On April 10, 2015, law enforcement agents also sought to interview WILMA ROMERO

and RICCO ROMERO regarding the source of the $90,000 in United States currency but were

unable to locate either of them.  However, law enforcement agents encountered RICCO

ROMERO's wife, ELENA CARABAJAL, who stated that MELISSA ROMERO's mother,

ABBY MARTINEZ, had put up her residence as collateral.

18.    Law enforcement agents thereafter located and interviewed ABBY MARTINEZ.  ABBY

MARTINEZ initially made statements to the law enforcement agents to the effect that she had

contributed $75,000 cash for IVAN ROMERO's bond, and that money had come from savings that

she had accumulated over several years.  When asked where she had kept that money,

MARTINEZ avoided the question and eventually began crying.  MARTINEZ told the law

enforcement officers that she had been deceptive and would tell them the truth.  MARTINEZ then

stated that on April 3, 2015, she met with MELISSA ROMERO, RICCO ROMERO and WILMA

ROMERO at residence of another of her daughters, JENNIFER PACHECO.  MARTINEZ

continued that MELISSA ROMERO, RICCO ROMERO and WILMA ROMERO made up a story

that was to be told to law enforcement if asked where the money for IVAN ROMERO's bond came

from.  More specifically, MELISSA ROMERO, RICCO ROMERO and WILMA ROMERO told

MARTINEZ to tell law enforcement that she had provided money for IVAN ROMERO's bond.

MARTINEZ stated she did not put up her house as collateral nor contributed any money towards

IVAN ROMERO's bond, but she only said that she had because MELISSA ROMERO had asked

her to assist with a cover story.  MARTINEZ further stated that RICCO ROMERO made

statements to the effect that he already possessed half of the money for ROMERO's bond.  At the

conclusion of that meeting, RICCO ROMERO and WILMA ROMERO left to go to WILMA

ROMERO's residence in Arroyo Hondo, New Mexico, to obtain additional money for IVAN

ROMERO's bond.  MARTINEZ stated that before WILMA ROMERO and RICCO ROMERO

departed, they made statements to the effect that the money for IVAN ROMERO's bond belonged

to IVAN ROMERO, and that WILMA ROMERO was keeping IVAN ROMERO's money in a safe

in her residence.  (As noted above, SOI#3 had previously informed law enforcement that IVAN

ROMERO kept money and drugs at WILMA ROMERO's residence.)

19.     On April 20, 2015, I spoke to WILMA ROMERO by telephone.  I asked WILMA

ROMERO if she had posted bond for IVAN ROMERO.  She stated that friends and family had

posted the bond, and that she had contributed $20,000 of her savings for that purpose.  WILMA

ROMERO told me to check with the Internal Revenue Service (IRS) about the $20,000 that she

had purportedly contributed for IVAN ROMERO's bond.  WILMA ROMERO then hung up

ending that phone call.

20.     On April 20, 2015, I also interviewed RICCO ROMERO by telephone.   I asked RICCO

ROMERO if he helped post IVAN ROMERO's bond on April 3, 2015.  RICCO ROMERO replied

"yeah."  I then asked RICCO ROMERO where the bond money came from.  RICCO ROMERO

stated family and friends contributed to ROMERO's bond.  I asked RICCO ROMERO if he could

provide the names of the individuals whom contributed bond money.  RICCO ROMERO declined

to provide that information, but instead stated that the money came from about ten different people.

RICCO ROMERO added that they have a list of names of the people whom contributed to IVAN

ROMERO's bond.  When I asked if WILMA ROMERO had contributed any money for IVAN

ROMERO's bond,  RICCO ROMERO replied that WILMA ROMERO had provided some money

but did not disclose how much she contributed.  RICCO ROMERO also stated that he was working

15

construction with "friends" and was getting paid cash. RICCO ROMERO elaborated that when he worked for long periods of time he was typically paid with checks, but he would be paid in cash when working short-term jobs. I asked RICCO ROMERO if he reported any income to the state, and he responded "well, yeah, I report it."

21.     Neither IVAN ROMERO nor his wife, brother or mother are known to have sufficient lawful income or assets to account for the $90,000 in bulk cash that was exchanged at People's Bank for a cashier's check used to post IVAN ROMERO's bond.

   a.   When arraigned by Taos County Magistrate Judge Jeffery Shannon on April 7, 2015, IVAN ROMERO submitted documents showing that he has had no substantial employment over the past several years. In those documents, ROMERO indicated that he was self-employed as a dog breeder, but he does not hold a breeder's license from Taos County or the State of New Mexico. On May 4, 2015, I reviewed a law enforcement data base regarding IVAN ROMERO's work history. Those records indicate that: from January 2009 to December 2009, IVAN ROMERO worked for Don B. Pennington, and earned approximately $15,977.25; from July 2011 to September 2011 and October 2011 to December 2011, IVAN ROMERO worked at Taos Cleaning Sweep LLC, and earned approximately $2,647.50 and $1,297.50 during those respective spans; and during the span from October 2011 to December 2011, IVAN ROMERO also worked for Amos Cohn and earned approximately $586.50. I found no record of IVAN ROMERO earning any wages since 2011. Further, records of the New Mexico Taxation and Revenue Department reflect that IVAN ROMERO has not filed a New Mexico Personal Income Tax Return for any of the past five years (i.e., tax years 2010 through 2014); IVAN ROMERO last filed a New Mexico Personal Income Tax Return jointly with MELISSA ROMERO for tax year

2009.  New Mexico Taxation and Revenue Department records also show that IVAN ROMERO is not registered with a New Mexico Combined Reporting System (CRS) and has not paid any New Mexico Gross Receipts Taxes.

b.   On May 4, 2015, I reviewed a law enforcement data base pertaining to MELISSA ROMERO's work history.  I learned that MELISSA ROMERO worked for Southern Methodist University from April 2011, thru December 2011, and earned approximately $6,634.50.  Furthermore, between April 2012, and June 2012, MELISSA ROMERO again worked for Southern Methodist University and earned approximately $2,190.00.  Since then, I found no record with New Mexico Work Force Solutions of MELISSA ROMERO earning any wages.   As with her husband, IVAN ROMERO, records of the New Mexico Taxation and Revenue Department reflect that MELISSA ROMERO did not file New Mexico Personal Income Tax Returns for the past five tax years, and that she last filed a tax return jointly with IVAN ROMERO for tax year 2009.  New Mexico Taxation and Revenue Department records also show that MELISSA ROMERO is not registered with a New Mexico CRS and has not paid any New Mexico Gross Receipts Tax.

c.   On May 4, 2015, I reviewed a law enforcement data base regarding RICCO ROMERO's employment history.  I learned that RICCO ROMERO worked for Don B. Pennington from July 2009, thru December 2009, and earned approximately $5,365.  Since then, I found no record with New Mexico Work Force Solutions of RICCO ROMERO receiving any wages.  Records of the New Mexico Taxation and Revenue Department similarly show that RICCO ROMERO has not filed a New Mexico Personal Income Tax Returns for the past five tax years; RICCO ROMERO last filed a New Mexico Personal Income Tax Return for tax year 2009.  RICCO ROMERO is not registered with a New Mexico CRS

17

and has not paid any New Mexico Gross Receipts Tax.

d.  On May 4, 2015, I reviewed a law enforcement data base pertaining to employment records for WILMA ROMERO. I learned that WILMA ROMERO has been employed since April 2009. WILMA ROMERO received wages from Mountain Home Health Care, Inc., from April 2009 to June 2013: from April 2009 to December 2009, WILMA ROMERO earned approximately $7,668.66; from January 2010 to December 2010, WILMA ROMERO earned approximately $14,093.09; from January 2011 to December 2011, WILMA ROMERO earned approximately $15,407.13; from January 2012 to December 2012, WILMA ROMERO earned approximately $12,421.88; and from January 2013 to June 2013, Wilma ROMERO earned approximately $4,104.51. Since July 2013, WILMA ROMERO has been employed by Options Services, Inc., and received wages: from July 2013 to 2013, Wilma ROMERO earned approximately $4,399.50; from January 2014 to December 2014, WILMA ROMERO earned approximately $12,639.63; and she earned approximately $3,386 from January to May, 2015. Records of the New Mexico Taxation and Revenue Department reflect that WILMA ROMERO filed tax returns in each of the past five years. In those returns, WILMA ROMERO reported Federal Adjusted Gross Income of: $14,093 for tax year 2010; 15,407 for tax year 2011; $12,422 for tax year 2012; $8,504 for tax year 2013; and $12,640 for tax year 2014. WILMA ROMERO is not registered with a New Mexico CRS and has not paid New Mexico Gross Receipts Taxes. WILMA ROMERO's modest income does not account for the $90,000 in noxious bulk currency that RICCO ROMERO, MELISSA ROMERO and WILMA ROMERO delivered to People's Bank. Indeed, according to WILMA ROMERO's employment records, her aggregate earnings in the six-years from April 2009 to April 2015 total less than $75,000.

18

22.     The $90,000 in bulk currency that RICCO ROMERO, MELISSA ROMERO and WILMA

ROMERO delivered to People's Bank on April 3, 2015, did not include the $64,920 seized on

April 2, 2015.  The $64,920 in bulk United States currency found at IVAN ROMERO's residence

on April 2, 2015, was seized by law enforcement on that date.

23.     Bank records provide additional evidence of IVAN ROMERO's and MELISSA

ROMERO's unexplained wealth.  IVAN ROMERO and MELISSA ROMERO share an account at

People's Bank.   Bank records show that during the period from 2010 to 2014, IVAN ROMERO

and/or MELISSA ROMERO made deposits into their joint account totaling approximately

$129,551.40.   A small portion ($7,695.77) of those deposits is attributed to MELISSA

ROMERO's earnings from Southern Methodist University.  Other checks or money orders

accounted for an additional $2,110.77 of the deposits.  The remaining deposits ($119,744.86) do

not appear to have been derived from any lawful earnings or income.

24.     Although IVAN ROMERO was previously released on $90,000 bond as discussed above,

he soon violated the conditions of his release, was remanded, and a successive bond was set at

$150,000 (in addition to the $90,000 which is still held by the court).

25.     During the span from approximately May 1, 2015, to May 17, 2015, IVAN ROMERO was

detained at the Santa Fe County Detention Center.   I obtained recorded telephone calls placed by

ROMERO while he was in jail.   At the outset of each of those calls, a recorded message advised

the participants that the call was from a correctional facility and was being recorded.  Examples of

those telephone calls are summarized below.

    a.     On May 2, 2015, IVAN ROMERO placed a telephone call to and WILMA ROMERO.

       During the call, ROMERO expressed the desire to get out of jail, and he and WILMA

ROMERO discussed the $150,000 supplemental bond.  WILMA ROMERO recommended that IVAN ROMERO remain in jail, but he was adamant that he intended to post bond to secure his release.  The conversation turned to the source of the money for the bond, and IVAN ROMERO made a statement to the effect that "If they wanna know where the money came from I'll just fight it."  WILMA ROMERO replied, "How are you gonna fight for it Ivan, like **they were asking about the $90,000 where they came from, we were over here getting all kinds of people to say this and this, and that, and now $150,000, who's gonna say what**."  (Emphasis added.)   Ivan replied, "Fuck it, they can try and take it."

b.   On May 14, 2015, IVAN ROMERO spoke with RICCO ROMERO in a recorded telephone call.  During that call, RICCO ROMERO stated that "Paulie" (believed to be in reference to PAUL DOMINGUEZ) had agreed to post bond for ROMERO.  Further, they then discussed that DOMINGUEZ was likely going to be questioned by police and that DOMINGUEZ needed to be prepared for police questioning.  RICCO ROMERO explained that DOMINGUEZ was willing to provide a statement in court as to how he purportedly obtained $150,000 for IVAN ROMERO's bail.   Additionally, RICCO ROMERO informed IVAN ROMERO that on May 13, 2015, he treated DOMINGUEZ and NATICIA TAFOYA DURAN to dinner at a restaurant to further discuss IVAN ROMERO's bail.

c.   Later that same day, May 14, 2015, IVAN ROMERO spoke with DOMINGUEZ in a recorded telephone call.  During that call, IVAN ROMERO thanked DOMINGUEZ for agreeing to post IVAN ROMERO's bail.  DOMINGUEZ discussed their friendship.  IVAN ROMERO cautioned DOMINGUEZ that police were going to ask him where the money came from and advised him to be prepared to explain.  DOMINGUEZ stated that he

had received money from his grandfather and that TAFOYA had also received a large sum

of money from her father, and that both he and TAFOYA would provide money for IVAN

ROMERO's bond.

d.   On May 15, 2015, IVAN ROMERO spoke with his wife, MELISSA ROMERO, in a

recorded telephone call.  During that call, MELISSA ROMERO informed IVAN

ROMERO that she couldn't get enough money to post IVAN ROMERO's bond, and he

would have to wait a couple of days for his brother (RICCO ROMERO).   They also

discussed DOMINGUEZ posting IVAN ROMERO's bond in a couple of days.

e.   In the early afternoon of May 17, 2015, IVAN ROMERO spoke with WILMA ROMERO

and RICCO ROMERO in a recorded telephone conversation.   IVAN ROMERO asked

WILMA ROMERO if she had spoken with DOMINGUEZ, and WILMA ROMERO called

RICCO ROMERO to the phone.  IVAN ROMERO instructed RICCO ROMERO to

coordinate with DOMINGUEZ to meet at the bank.   When WILMA ROMERO returned to

the call, IVAN ROMERO asked her to make sure that RICCO ROMERO and

DOMINGUEZ got to the bank before it closed.  WILMA ROMERO and IVAN ROMERO

discussed whether they would have time to travel to Santa Fe to post bond at the Detention

Center that same day.

26.   DOMINGUEZ (who resides in Rio Rancho, NM,) evidently did not travel to Taos as

planned on May 17, 2015.   In his place, TAFOYA (who also resides in Rio Ranchos, NM,)

traveled to Taos.  In Taos, TAFOYA visited a branch of People's Bank at 710A Paseo del Pueblo

Sur, Taos, New Mexico, where she presented $150,000 in bulk United States currency. TAFOYA

exchanged that bulk cash for a bank check that was tendered later that day as IVAN ROMERO's

bond.[2]   Surveillance video from the bank indicates that MELISSA ROMERO met TAFOYA in the parking lot outside of the bank.

27.     IVAN ROMERO was not immediately released from jail, and he placed another telephone call to MELISSA ROMERO at approximately 4:29 p.m. on May 17, 2015.  MELISSA ROMERO advised IVAN ROMERO that he would not be released that evening because the bond needed to be confirmed or authorized.    MELISSA ROMERO noted that "Paulie" was unable to make the trip because his mother had unexpectedly arrived at their house, and "Naticia" had come to Taos in his place to help secure IVAN ROMERO's release.  During this recorded call, MELISSA ROMERO received an alert that she had an incoming call.  MELISSA ROMERO stated that "Naticia" was calling but she did not interrupt her call with IVAN ROMERO to take that call. MELISSA ROMERO stated: "I wonder if she needs gas or something."  IVAN ROMERO indicated that he did not understand, and MELISSA ROMERO elaborated:  "Naticia—I should have gave her money."  IVAN ROMERO concurred and stated that MELISSA ROMERO should offer "Naticia" money for gas and other expenses.

28.     On June 8, 2015, law enforcement officers went to the branch of People's Bank in Taos to examine the $150,000.  The New Mexico State Police again assisted and provided drug-detection canine Arras.  The $150,000 in United States currency that NATICIA TAFOYA had delivered to the bank was placed in a box.  That box and two other (empty) boxes were placed in a conference room.  Arras was brought into that room and conducted an off-leash open-air inspection.  Arras alerted to the odor of narcotics at the box containing the currency.

---

[2] On May 26, 2015, IVAN ROMERO was arraigned in the Eighth Judicial District Court in Taos County.  At that time, Chief District Judge Jeff McElroy set or reduced his bond to $90,000.  The $150,000 posted to secure his release on May 17th is to be refunded.

## CONCLUSION

29.     Based on the facts and circumstances summarized herein, I respectfully submit that there is probable cause to believe that that IVAN ROMERO conspired with others to distribute, and has possessed and distributed, controlled substances in violation of 21 U.S.C. §§ 846 and 841(a)(1).

30.     Based on the facts and circumstances summarized herein, I respectfully submit that there is probable cause to believe that the $90,000 and $150,000 in bulk cash that RICCO ROMERO, MELISSA ROMERO, WILMA ROMERO, and NATICIA TAFOYA, delivered to the People's Bank on April 3, 2015, and May 17, 2015, represented proceeds of the ROMERO DTO's conspiracy to distribute, and the distribution of, controlled substances. There is also probable cause to believe that this monetary transactions were conducted in violation of 18 U.S.C. § 1957, and that these financial transactions were designed in whole or in part to conceal or disguise the nature,  source, ownership and control of those proceeds from the ROMERO DTO's distribution of controlled substances in violation of 18 U.S.C. § 1956(a).   Further, there is probable cause to believe that RICCO ROMERO, MELISSA ROMERO, WILMA ROMERO, and NATICIA TAFOYA conspired to commit those offenses in violation of 18 U.S.C. § 1956(h).

31.     Based upon the facts summarized in this Affidavit, there is probable cause to believe IVAN ROMERO and members of the ROMERO DTO store controlled substances, criminal proceeds, and other evidence related to the distribution of controlled substances and money laundering at the premises  at  # 30 Camino Del Albino, Arroyo Hondo, Taos County, New Mexico, (further described in Appendix A), and that evidence, contraband, fruit and instrumentalities of the crimes (described in Appendix B) will likely be found there.

32.    WHEREFORE, I respectfully request that a warrant be issued authorizing any agent of the

Drug Enforcement Administration, with assistance of other law enforcement personnel, to enter

and search the premises at # 30 Camino Del Albino, Arroyo Hondo, Taos County, New Mexico for

evidence, contraband, fruits and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846,

and 18 U.S.C. §§ 1956(h), 1956(a), and 1957.

I swear that the information set forth above is true and correct to the best of my knowledge.

Kevin M. Mondragon
Special Agent
Drug Enforcement Administration

Subscribed to and sworn to
before me, this 15th _____ of June, 2015

Chief United States Magistrate Judge
Albuquerque, New Mexico

24



05.08.2015 13:53

# APPENDIX A

## Location To Be Searched

The premises to be searched are located at 30 Camino Del Albino, Arroyo Hondo, New Mexico, Taos County.  The premises to be searched include: the real property; residence; garage; car-port; storage shed; out-buildings; curtilage; and any vehicles belonging to IVAN ROMERO, RICCO ROMERO, WILMA ROMERO or MELISSA ROMERO at that location at the time of the search.  The premises to be searched are located at the last residential address as one travels south on Camino Del Albino.

The residence located on the premises is a gray stucco house with a tan roof.  The front door of that house faces north with a small porch attached to the residence.  The porch has blue wood trim with wooden latillas attached on the west side.  The front door is brown, with a blue wooden screen door.  On the west side of the residence there are five windows with blue and white trim.  The south side of the residence has a back door with a wooden stairwell attached to the residence.

On the south side of the premises (approximately 20 yards south of the house) there is a dog kennel and white wooden shed.

On the north side of the premises there is a tan car-port which (approximately 15 yards north of the house).

# APPENDIX  B

## Items To Be Seized

1.   Controlled substances (other than any controlled substances prescribed by an authorized health care provider).

2.   United States currency, monetary instruments, precious metals, gems, jewelry and other items of value which may represent the proceeds of criminal drug distribution or evidence unexplained wealth.

3.  Records, documents and information in any form pertaining to controlled substance transactions including ledgers, drug transactions, account books, notes, names and/or code names or nicknames and/or identifying information reflecting customers, amounts of drugs bought and sold, amounts of money paid, owed or collected, and appointment calendars.

4.  Records, documents and information in any form pertaining to money laundering including bank statements,  credit card statements, money orders, cashier's checks, bank drafts, money remittance records, receipts, and other evidence of financial transactions or unexplained wealth.

5.  Any and all drug customer lists, dealers lists, or any notes containing the individual names of such persons, telephone numbers and/or addresses of these customers or dealers and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

6.  Computers, tablets, cellular telephones, and other digital devices which may hold the records, lists, and data described above (paragraphs 3, 4 and 5).

7.  Cellular telephones, paging devices, any other telecommunications instruments, contracts with communication service providers, invoices and bills for communication services, and telephone toll records.

8.  Firearms and ammunition.

9.  Photographs, videos or other images depicting controlled substances, currency, or personal property that may represent the proceeds of criminal drug distribution.

10.  Indications of ownership or control over real property and personal property including motor vehicles.

11.  Any safety deposit boxes or safes.